

Edith M. Kallas (*Pro Hac Vice pending*)
Joe R. Whatley, Jr. (*Pro Hac Vice pending*)
W. Tucker Brown (*Pro Hac Vice pending*)
Laurence J. Hasson (*Pro Hac Vice pending*)
**WHATLEY DRAKE & KALLAS, LLC**
1540 Broadway, 37th Floor
New York, NY 10036
(212) 447-7070

Stanley G. Grossman (*Pro Hac Vice pending*)
D. Brian Hufford (*Pro Hac Vice pending*)
Robert J. Axelrod (*Pro Hac Vice pending*)
**POMERANTZ HAUDEK BLOCK GROSSMAN & GROSS LLP**
100 Park Avenue
New York, NY 10017
(212) 661-1100

Raymond P. Boucher (CA Bar # 115364)
boucher@kbla.com
Helen Zukin (CA Bar # 117933)
zukin@kbla.com
Michael Eyerly (CA Bar # 178693)
eyerly@kbla.com
**KIESEL BOUCHER LARSON LLP**
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910
Telephone:(310) 854-4444/Facsimile:(310) 854-0812

*Attorneys for Plaintiff*

FILED

2009 MAR 25  AM 10: 03

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN MEDICAL ASSOCIATION, CALIFORNIA MEDICAL ASSOCIATION, MEDICAL ASSOCIATION OF GEORGIA, CONNECTICUT STATE MEDICAL SOCIETY, and NORTH CAROLINA MEDICAL SOCIETY, and STEPHEN D. HENRY, M.D. and JAMES G. SCHWENDIG, M.D., Individually And On Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br>          v.<br><br>WELLPOINT, INC.<br><br>                    Defendant. | Case No. CV09-2039 VBKx<br><br>**CLASS ACTION COMPLAINT**<br>and<br>**DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Stephen D. Henry, M.D. and James G. Schwendig, M.D. (the "Individual Plaintiffs") bring this action on behalf of themselves and all others similarly situated, and Plaintiffs American Medical Association ("AMA"), California Medical Association ("CMA"), Medical Association of Georgia ("MAG"), Connecticut State Medical Society ("CSMS"), and North Carolina Medical Society ("NCMS") (collectively the "Associational Plaintiffs") bring this action on behalf of themselves and/or on behalf of their membership against Defendant WellPoint, Inc., ("WellPoint" or "Defendant"), and allege:

## SUMMARY OF CLAIMS

1.   The Individual Plaintiffs bring this case as a class action on behalf of themselves and all those similarly situated physicians and physician groups (the "Class") (defined below) who are, or have been nonparticipating, or "out-of-network," providers ("Nonpars" or "Non-participating" physicians or providers), in that they have not been members in WellPoint's physicians networks during all or a part of the period from September 29, 2006 through the present (the "Class Period"), alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq*. The Individual Plaintiffs also bring this action on their own behalf and on behalf of a subclass of the Class for additional violations of the Employee Retirement Income Security Act of 1974 ("ERISA") and Count V (the "ERISA Subclass") (defined below). As Nonpars in WellPoint's physicians' networks, the Individual Plaintiffs and the Class have been harmed by underpayments made by WellPoint for out-of-network services that they provided to plan enrollees. These underpayments are pervasive and result from systematic operating procedures employed by WellPoint, which affect thousands of Nonpars every year.

2.   The Associational Plaintiffs bring this case on their own behalf and/or on behalf of their membership of physicians. The Associational Plaintiffs are dedicated to advocating for the rights of physicians and patients alike for the delivery of the

highest quality of medical care.  All of the Associational Plaintiffs bring this action on behalf of their members who have been injured as a result of the egregious acts and practices of WellPoint as set forth in this Complaint.  The Associational Plaintiffs have also been directly injured by the challenged conduct.  As a result of WellPoint's unlawful practices discussed herein, the Associational Plaintiffs have been required to devote substantial time and resources addressing these issues by counseling their members on how to deal with the practices at issue, monitoring the payment practices of WellPoint, corresponding with WellPoint, advocating on their members' behalf, and/or communicating with regulators concerning WellPoint's misconduct, among other things.  Accordingly, the Associational Plaintiffs allege violations of ERISA on behalf of their membership, and violations of RICO and the Sherman Act, on behalf of themselves and/or their membership, against WellPoint as set forth below.

3.     The Individual Plaintiffs and the Associational Plaintiffs are collectively referred to herein as "Plaintiffs."

4.     Participating, or in-network providers ("Pars") are physicians who have signed a contract with a particular managed care entity and receive reimbursement of eligible charges directly from that entity.  Pars agree to provide healthcare services to plan enrollees at reduced rates in exchange for access to the plan's patient base, among other things.  When visiting a Par, plan members are only responsible for co-payments, co-insurance, and payment for non-covered items (if any) at the time of service.

5.     Nonpars, by contrast, do not have a signed contract with a particular managed care entity.  Nonpars, therefore, may collect their full charges directly from patients at the time of service and are not required to accept reduced rates for procedures performed.  Rather than require plan members to pay out of pocket and in full for medical services, Nonpars may also agree to accept an assignment of benefits, which occurs when a plan member authorizes his health benefits plan to remit payment directly to the provider for covered services.  Managed care entities may

refuse to recognize the patient's assignment and still remit payment to the patient. Whether or not the health plan honors the assignment and pays the out-of-network benefit to the physician, Nonpars are entitled to bill the patient for the amount of the physician's charge that exceeds the amount the health plan covers, except in certain limited circumstances not relevant here.

6.    WellPoint contractually promises its members that it will pay for services performed by Nonpars at the lesser of the billed charge or the usual, customary and reasonable ("UCR") amount for the service rendered. WellPoint also contractually promises its members that the UCR rate for a service is the prevailing charge charged by most providers of comparable services in the specific area where the member received the service, with consideration given to the nature and severity of the member's condition, as well as any complications or unusual circumstances that would require additional time, skill, or experience on the part of the Nonpar.

7.    During the Class Period, WellPoint contributed provider charge data to and typically used a database that it licensed from a third-party, Ingenix, Inc. ("Ingenix"), which is owned by UnitedHealth Group, Inc., the second-largest insurer in the country, to price claims for reimbursement submitted by Nonpars. However, the defective and conflict-ridden Ingenix database fails to comply with the definition of UCR contained in WellPoint's insurance contracts, and instead has been used by WellPoint as a tool to deny, delay, and impede lawful reimbursement to Nonpars. WellPoint's own Executive Vice President and CEO of Commercial Business acknowledged the "conflicts of interest in the Ingenix database" in a press release announcing the insurer's $10 million settlement with the New York Attorney General ("NYAG") concerning the NYAG's investigation of Ingenix and historic reform of the healthcare reimbursement system.

8.    WellPoint's use of the defective Ingenix database, among other improper out-of-network pricing methods, forced Nonpars like the Individual Plaintiffs and the Class, and many members of the Associational Plaintiffs to expend significant time

and resources appealing improper UCR determinations and negotiating with WellPoint for their lawful reimbursement. WellPoint's wrongful conduct also frustrated the purpose of the Associational Plaintiffs as set forth below, causing them to exhaust significant time and resources advocating on behalf of their members' rights.

9. WellPoint further failed to disclose critical facts about Ingenix data that WellPoint used to make out-of-network reimbursement decisions. Although WellPoint was aware of serious, systemic flaws in the Ingenix database, WellPoint concealed these flaws in its communications to Nonpars. The Ingenix database, for example, averages charges from both physicians and other healthcare providers that are not medical doctors. It also fails to consider provider, patient, and procedure specific factors affecting charges. These known flaws, among others, were deliberately used by WellPoint to diminish reimbursement to Nonpars. The non-disclosure of these material facts prevented the Individual Plaintiffs and the Class from effectively challenging or appealing WellPoint's improper UCR determinations.

10. During the Class Period, WellPoint used other faulty methods for determining UCR when Ingenix data was unavailable.

11. Whether it used Ingenix data or another flawed methodology to price UCR, WellPoint routinely and systematically underpaid Nonpars who submitted claims for reimbursement for out-of-network services.

12. WellPoint's deceitful and pervasive business practices forced Plaintiffs and the Class to expend significant time and resources towards identifying, disputing and then appealing WellPoint's improper reimbursement determinations, oftentimes still resulting in underpayment. WellPoint's conduct violated its legal obligations to the Individual Plaintiffs and the Class, as assignees and beneficiaries of their patients' benefits, and violated federal and state law as described herein, causing Plaintiffs and the Class significant financial harm.

## JURISDICTION AND VENUE

13.     Subject matter jurisdiction exists under both 28 U.S.C. § 1331 and § 1332(d). The Individual Plaintiffs seek to represent all those similarly situated physicians and physicians' groups as set forth in the Class and ERISA Subclass definitions below.

14.     Venue is appropriately established in this District under 28 U.S.C. § 1391, and § 1965 of RICO, 18 U.S.C. § 1965, because WellPoint conducts a substantial amount of business in this District and insures and administers health plans both inside and outside of this District. Venue is also appropriate in this District because the Individual Plaintiffs are California state residents who practice medicine in California, and much of the conduct described below occurred in California. Likewise, CMA is a citizen of California and represents physicians licensed to practice medicine in this District and others throughout the State of California.

## PARTIES

### Individual Plaintiffs

15.     Plaintiff **Dr. Stephen D. Henry** is an internist providing primary care, with a specialty in HIV treatment, at a private, solo practice in Pasadena, CA.  Dr. Henry is a resident of the State of California and is licensed to practice medicine in California.  At all times relevant, Dr. Henry was a Nonpar in WellPoint's physicians' networks.

16.     Plaintiff **Dr. James G. Schwendig** is a trauma surgeon at Scripps Memorial Hospital in La Jolla, CA.  Dr. Schwendig is a resident of the State of California and is licensed to practice medicine in California.  At all times relevant, Dr. Schwendig was a Nonpar in WellPoint's physicians' networks.

17.     Drs. Henry and Schwendig are collectively referred to herein as the "Individual Plaintiffs."

**The Associational Plaintiffs**

18.    Plaintiff **American Medical Association ("AMA")** is headquartered in Chicago, Illinois.  The AMA is a national tax-exempt membership organization that represents the interests of approximately 240,000 physicians, residents and medical students, as well as their patients located in California and throughout the United States.  As the largest medical association in the United States and as the owner of Current Procedural Terminology ("CPT"), the AMA works to represent its members with respect to payment practices by payors, such as WellPoint, to healthcare providers, particularly physicians.  Both AMA physicians and AMA in its own capacity have been injured by the egregious acts and practices of Defendant as set forth in this Complaint.

19.    AMA appears herein on behalf of itself and its members, and also as a representative of the Litigation Center of the AMA and State Medical Societies.  The Litigation Center was formed in 1995 as a coalition of the AMA and private, voluntary, nonprofit state medical societies to represent the views of organized medicine in the courts.

20.    AMA has individual standing as it has been injured by WellPoint's wrongful conduct as alleged herein.  AMA has expended considerable time and resources helping its members deal with issues concerning WellPoint's improper UCR reimbursements.

21.    AMA also has associational standing on behalf of its members who have claims against WellPoint for the violations alleged in this complaint.  In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, AMA seeks declaratory and injunctive relief.

22.    Plaintiff **California Medical Association ("CMA")** is a non-profit, incorporated professional association of California physicians established in 1856, with its principal place of business in Sacramento, California.  CMA is comprised of more than 35,000 physicians practicing medicine in all specialties and serving

patients in all demographics throughout the State of California. CMA's mission is to promote the art and science of medicine, the care and well being of patients, the protection of the public health and the betterment of the medical profession. CMA actively engages in the legislative, judicial, political and regulatory processes to carry out its mission. Additionally, CMA regularly engages government and private health plans to advocate for the interests of its members.

23.    CMA has individual standing as it has been injured by WellPoint's wrongful conduct as alleged herein. CMA has expended considerable time and resources helping its members deal with issues concerning WellPoint's improper UCR reimbursements, including, without limitation, devoting resources from its Center for Economic Services to help members deal with WellPoint's out-of-network reimbursement practices.

24.    CMA also has associational standing on behalf of its members who have claims against WellPoint for the violations alleged in this complaint. Individual Plaintiffs Drs. Henry and Schwendig are active members of CMA. In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, CMA seeks declaratory and injunctive relief.

25.    Plaintiff **Medical Association of Georgia ("MAG")** is a non-profit, voluntary professional association of Georgia physicians. MAG was founded in 1849, is an affiliate of the American Medical Association, and is the largest physician association in Georgia. Presently, MAG has over 8,000 members – more than 5,000 of whom are physicians actively practicing medicine in the State of Georgia. MAG was founded to promote the art and science of medicine and the improvement of public health. With these ends in mind, MAG actively works to advocate physician and patient positions in the United States Congress, the Georgia General Assembly, before state and federal courts, and in the private sector with large health plans, hospitals and other entities that significantly affect patient care.

---

26.    MAG has individual standing as it has been injured by WellPoint's wrongful conduct as alleged herein.    MAG has expended considerable time and resources helping its members deal with issues concerning WellPoint's improper UCR reimbursements.

27.    MAG also has associational standing on behalf of its members who have claims against WellPoint for the violations alleged in this complaint.    In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, MAG seeks declaratory and injunctive relief.

28.    Plaintiff **Connecticut State Medical Society ("CSMS")** is a federation of eight component county medical associations, with a total membership exceeding 7,000 physicians and medical students. CSMS itself is a constituent state entity of the American Medical Association.    Founded by the physician-patriots of the American Revolution, the Society operates from a heritage of democratic principles embodied in its Charter and Bylaws.    The philosophy and purpose of the CSMS is to promote the highest standards of medical care in the State of Connecticut, to work to preserve the integrity and independence of physicians, and to support the sanctity of the physician-patient relationship for the benefit of the public by, among other things, facilitating and assisting its physicians in providing top quality care to their patients, providing them with a unified voice and enabling them to take concerted action on behalf of their profession and of their patients, and acting and advocating on their behalf to preserve the ability, independence and freedom of physicians to render the best possible care to every patient.    CSMS physicians have been injured by the egregious acts and practices of Defendants as set forth in this Complaint.

29.    CSMS has associational standing on behalf of its members who have claims against WellPoint for the violations alleged in this complaint and seeks declaratory and injunctive relief.

30.    Plaintiff **North Carolina Medical Society ("NCMS")** is a North Carolina not-for-profit corporation organized and existing under the laws of North

Carolina since 1849, with its headquarters located in Raleigh, North Carolina. NCMS represents over 11,000 members in North Carolina, including licensed physicians, physician assistants, medical interns and residents, medical students and retired physicians.

31.    The philosophy and purpose of NCMS is to promote medical science, medical knowledge, and the highest standards of medical care in North Carolina. NCMS strives to enhance access to medical care of high quality to all people in North Carolina and to promote high standards in the practice of medicine in an effort to ensure that quality medical care is available to the public by inter alia, promoting competence in the art of medical practice, making the medical profession more useful to the public in the prevention and care of disease and improving the quality of life. NCMS is the largest physician organization in North Carolina. NCMS unifies doctors across North Carolina in all specialties and work settings on issues related to, inter alia: the physician-patient relationship, health and insurance regulation, and patient safety. NCMS devotes significant resources to advocating physician viewpoints in the public policy arena.  Specifically, NCMS and its member physicians take an active role in issues raised by private companies, institutions, administrative agencies and the North Carolina General Assembly and work to assure that the views of the medical community are presented in an organized and effective fashion.

32.    NCMS has individual standing as it has been injured by WellPoint's wrongful conduct as alleged herein.  NCMS has expended considerable time and resources helping its members deal with issues concerning WellPoint's improper UCR reimbursements.

33.    NCMS also has associational standing on behalf of its members who have claims against WellPoint for the violations alleged in this complaint.  In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, NCMS seeks declaratory and injunctive relief.

34.    Plaintiffs AMA, CMA, MAG, CSMS, and NCMS are collectively referred to herein as the "Associational Plaintiffs."

35.    The Individual Plaintiffs and the Associational Plaintiffs are collectively referred to herein as "Plaintiffs."

**The Defendant**

36.    Defendant **WellPoint, Inc. ("WellPoint")** was created in or around 2004 by the merger of California-based WellPoint Health Networks, Inc. with Indianapolis-based Anthem, Inc.   The merged companies changed their name to WellPoint, Inc. on or about November 30, 2004.   WellPoint has its corporate headquarters at 120 Monument Circle, Indianapolis, Indiana 46204.  As the successor entity to Anthem, Inc., WellPoint, Inc. is liable for Anthem's actions both before and after the merger between the two companies.

37.    WellPoint is the largest health benefits company in terms of medical membership in the United States with 35 million medical members as of December 31, 2008.  WellPoint is an independent licensee of the Blue Cross and Blue Shield Association, or BCBSA, an association of independent health benefit plans. WellPoint serves as the Blue Cross licensee for California and as the Blue Cross and Blue Shield, or BCBS, licensee for: Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as BCBS in 10 New York city metropolitan and surrounding counties, and as Blue Cross or BCBS in selected upstate counties only), Ohio, Virginia (excluding the Northern Virginia suburbs of Washington, D.C.), and Wisconsin. In a majority of these service areas, WellPoint does business as Anthem Blue Cross, Anthem Blue Cross Blue Shield or Empire Blue Cross Blue Shield (in its New York service areas). WellPoint also serves members throughout the country as UniCare.   WellPoint is licensed to conduct insurance operations in all 50 states through its subsidiaries.

38.    WellPoint serves customers throughout the United States under various names and operates, trades or otherwise does business through a variety of subsidiary companies and/or affiliates including, but not limited to, the following: Anthem Blue Cross and Blue Shield Plan Administrator, LLC; Anthem Blue Cross Blue Shield Partnership Plan, Inc.; Anthem Blue Cross Life and Health Insurance Company; Anthem Health Plans of Kentucky, Inc., d/b/a! Anthem Blue Cross and Blue Shield; Anthem Health Plans of Maine, Inc., d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of New Hampshire, Inc., d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Virginia, Inc., d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans, Inc., d/b/a Anthem Blue Cross and Blue Shield; Anthem Insurance Companies, Inc., d/b/a Anthem Blue Cross and Blue Shield; Anthem Life Insurance Company; Anthem Life & Disability Insurance Company; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.; Blue Cross Blue Shield of Wisconsin, d/b/a Anthem Blue Cross and Blue Shield; Blue Cross of California, d/b/a Anthem Blue Cross; Blue Cross of California Partnership Plan, Inc., d/b/a Anthem Blue Cross Partnership Plan; Claim Management Services, Inc., d/b/a Anthem Blue Cross and Blue Shield; Community Insurance Company, d/b/a Anthem Blue Cross and Blue Shield; Compcare Health Services Insurance Corporation, d/b/a Anthem Blue Cross and Blue Shield; Empire HealthChoice Assurance, Inc., d/b/a Empire BlueCross BlueShield; Empire HealthChoice HMO, Inc., d/b/a Empire BlueCross BlueShield HMO; Golden West Health Plan, Inc.; HealthKeepers, Inc.; Healthy Alliance Life Insurance Company, d/b/a Anthem Blue Cross and Blue Shield; HMO Colorado, Inc.; HMO Colorado, Inc., d/b/a HMO Nevada; HMO Missouri, Inc., d/b/a Anthem Blue Cross and Blue Shield; Machigonne, Inc.; Matthew Thornton Health Plan, Inc., d/b/a Anthem Blue Cross and Blue Shield; Peninsula Health Care, Inc.; Priority Health Care, Inc.; RightCHOICE Managed Care, Inc., d/b/a Anthem Blue Cross and Blue Shield; Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and

Blue Shield; UNICARE Health Insurance Company of Texas; UNICARE Health Insurance Company of the Midwest; UNICARE Health Plan of Kansas, Inc.; UNICARE Health Plan of West Virginia, Inc.; UNICARE Health Plans of Texas, Inc.; UNICARE Health Plans of the Midwest, Inc.; UniCare Life & Health Insurance Company; UNICARE of Texas Health Plans, Inc.; WellChoice Insurance of New Jersey, Inc.  WellPoint acts through its subsidiaries or affiliates with respect to the practices at issue in this case.

39.    WellPoint and its subsidiaries and affiliates are collectively referred to herein as "WellPoint" or "Defendant."

## PARTICIPATING VERSUS NON-PARTICIPATING PHYSICIAN SERVICES

40.    Providers can either enter into an agreement with WellPoint or they can provide services to WellPoint's subscribers without any contract with WellPoint governing that relationship.

41.    Where medical services are provided by a physician who has contracted with WellPoint or one of its competitors, the total reimbursement is a fee for service payment based upon the contractually agreed fee schedule normally attached to the provider contract.  In this instance, the subscriber will usually pay a co-payment or some percentage of the charge based upon the subscriber's agreement with WellPoint, the particular service rendered, and the particular plan enrollment.

42.    Where medical services are provided by a physician who has not contracted with WellPoint, no specific reimbursement rate has been agreed to by the provider and the provider may charge whatever he or she chooses.  While a Nonpar may bill the retail costs of its procedures, WellPoint does not necessarily pay the total amount billed.  Rather, WellPoint pays on a fee for service basis that is determined as the lesser of the provider's billed charges or a percentage of the usual, customary and reasonable amount as determined by WellPoint.

43. The UCR amount is the maximum amount the insurer will consider eligible for reimbursement to Nonpars who are outside of their network. UCR is supposedly determined based on a review of the prevailing charges made by peer physicians for a particular medical or health service by a specific type of physician within a specific community or geographical area. However, UCR is typically set by WellPoint and other insurance carriers using various internal and external data sources. The most common data source utilized to determine UCR is the Ingenix database.

## THE INGENIX DATABASE

44. The Ingenix database cannot accurately or properly determine UCR. Nevertheless, at all relevant times WellPoint relied upon and utilized the Ingenix database to make UCR determinations. The Ingenix database includes two related databases which are based on the identical underlying data, known as the Prevailing Healthcare Charges System ("PHCS") and Medical Data Research ("MDR"). At various periods of time, WellPoint contributed claims data to Ingenix and received a discount on the purchase of the Ingenix database in return.

45. In December 1997, Ingenix purchased Medicode, Inc., a Salt Lake City-based provider of healthcare products, including MDR. In October 1998, Ingenix, a wholly-owned subsidiary of UnitedHealth Group, purchased a UCR database, PHCS, from the Health Insurance Association of America ("HIAA"), an insurance trade association.

46. Since 1973, HIAA had produced and marketed its database primarily to insurers, such as WellPoint. However, HIAA informed the data purchasers (including WellPoint) that it was not endorsing, approving, or recommending the use of any of its data for any particular purpose. In fact, HIAA released its data with a disclaimer that specifically stated, in relevant part, that the data was being provided to members [i.e., companies such as WellPoint] for informational purposes only. The

HIAA disclaimed any endorsement, approval or recommendation of the data, or its use to determine "usual and customary" charges.

47. Once Ingenix acquired PHCS from HIAA in 1998, it continued to use substantially the same disclaimer in its communications with insurers including WellPoint.

48. Nevertheless, throughout the Class Period, WellPoint both contributed to and used the Ingenix database as a primary source of data upon which it bases its UCR determinations, even though WellPoint knows that the data cannot and should not be used for that purpose. WellPoint is fully aware that the Ingenix database is not properly designed to determine UCR reimbursement amounts.

49. There are a number of inherent flaws in the Ingenix data which makes it an invalid and inappropriate basis for setting UCR rates. Among other flaws, the Ingenix database:

    (a) Does not determine the numbers or types of providers in any geographic area;

    (b) Does not determine the actual types of procedures within a geographic area;

    (c) Collects charge data which is not representative of the actual number of procedures performed within a geographic area;

    (d) Does not collect sufficient data to enable its users to determine whether the data reflects the charges of providers with any particular degree of expertise or specialization;

    (e) Does not collect sufficient provider-specific data to enable its users to determine whether the charges are from one provider, from several providers, or from only a minority or specific subset of the providers in a geographic area;

    (f) Fails to compare providers of the same or similar training and experience level and, instead, combines and averages all provider

charges by procedure code without even separating the charges of physicians and non-physicians;

(g)    Does not collect patient specific information such as age or medical history or condition;

(h)    Does not ascertain the most common charge for the same service or comparable service or supply;

(i)    Does not determine the place of service or type of facility;

(j)    Does not collect sufficient data to enable it or its users to determine an appropriate medical market for comparing like charges;

(k)    Combines zip codes inappropriately, and uses zip codes instead of appropriate medical markets;

(l)    Fails to compare procedures that use the same or similar resources (and other costs) to the provider but, rather, indiscriminately combines all provider charges by procedure code without regard to such factors;

(m)    Fails to compare procedures of the same or similar complexity by, among other things, failing to record or account for CPT code modifiers;

(n)    Does not use an appropriate statistical methodology;

(o)    Does not properly consider charging protocols and billing practices generally accepted by the medical community or specialty groups;

(p)    Does not properly consider medical costs in setting geographic areas;

(q)    Lacks quality control, such as basic auditing, to ensure the validity, completeness, representativeness, and authenticity of the data submitted;

(r)     Is subject to pre-editing by data contributors;

(s)     Reports charges that are systemically skewed downward;

(t)     Uses relative values and conversion factors to derive inappropriate UCR amounts;

(u)     Uses a methodology that does not comply with WellPoint's contractual definition of UCR; and

(v)     Purports to be confidential and/or proprietary, which prevents access to, and scrutiny of, the data by members or their employers.

50.     These and other flaws render WellPoint's use of Ingenix data invalid and unlawful for determining UCR rates. By systematically and typically making UCR determinations without compliant and valid data to substantiate its determinations, WellPoint has breached its obligation to reimburse the Individual Plaintiffs and the Class for out-of-network services.  Accordingly, all past UCR determinations based on Ingenix's noncompliant data should be overturned.

## THE NYAG'S INVESTIGATION OF INGENIX

51.     In a separate investigation into the flawed Ingenix database conducted by the NYAG, Andrew M. Cuomo, Mr. Cuomo concluded that "the Ingenix databases in fact under-reimburse consumers."  State of N.Y. Office of the Att'y Gen., Health Care Report: The Consumer Reimbursement System is Code Blue (January 13, 2009).

52.     According to Mr. Cuomo's report, an analysis of the New York market showed that insurers that used Ingenix and other similar methods to determine UCR "systematically under-reimburse New Yorkers for doctor's office visits." *Id.*

53.     "When extrapolated across the State and the country, it is fair to say that the Ingenix databases have caused Americans to be under-reimbursed to the tune of at least hundreds of millions of dollars over the past ten years." *Id.*  Physicians like the Individual Plaintiffs, the Class, and members of the Associational Plaintiffs, of course, are primary victims of this under reimbursement scheme.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

54.    Moreover, the Individual Plaintiffs and the Class have also been disparaged by the pervasive under-reimbursement scheme, and their physician–patient relationships have been disrupted.    According to Mr. Cuomo: "The responsible consumer reads the plan documents and sees a thicket of words. One term seems intelligible: the "usual and customary rate" of a similar physician for a similar service in a similar area. That sounds reasonable. The consumer makes the leap out-of-network and submits the bill to the insurer, only to be told the consumer will not be fully reimbursed because the doctor's charge exceeded the usual and customary rate. The fog of ignorance continues, thanks to the insurer. The physician-patient relationship is undermined, as the physician has been branded a charlatan whose bills are inflated. No one's interests here are advanced, except perhaps when next time, the consumer decides to stay in network for fear of what bills may accrue for out-of-network care. The interests advanced in that event are those of the insurer, whether by accident or design." *Id.*  In addition to the negative impact that this disparagement has had on Nonpars like the Individual Plaintiffs and the Class, the disruption of the patient-doctor relationship has significantly harmed the Associational Plaintiffs, which seek to safeguard this relationship.

55.    In discussing where the blame for this under-reimbursement scheme should lie, the NYAG explained: "[T]he fault cannot be laid on Ingenix alone. All industry members have benefited unfairly at the expense of consumers over the past ten years, and they continue to benefit unfairly from a rigged system day after day." *Id.*  WellPoint, as a significant beneficiary of the Ingenix database, should therefore be held accountable for its use of the database to under-reimburse the Individual Plaintiffs and the Class.

56.    Simultaneous with the release of the NYAG's findings, UnitedHealth Group, Inc., the owner of the Ingenix database, settled claims centering on the Ingenix database and UCR reimbursements with the NYAG and the AMA, among others.  As part of the NYAG settlement, UnitedHealth Group agreed to pay the

NYAG approximately $50 million. These funds are earmarked for the creation of an independent non-profit organization, which will own and operate a new database to be used for UCR determinations. This new database will be designed to take the place of the Ingenix database.

57.    Although the first, UnitedHealth Group was not the only insurer to settle claims with the NYAG concerning the use of Ingenix data. Indeed, the use of Ingenix is so widespread that many insurers, including WellPoint, settled similar claims with the NYAG in what has become an historic effort to overhaul the nation's out-of-network healthcare reimbursement system. Namely, on January 15, 2009, the NYAG announced a settlement with Aetna for $20 million; on February 4, 2009, the NYAG announced a settlement with MVP Health Care, Inc. for $535,000; on February 10, 2009, the NYAG announced a settlement with Independent Health for $475,000 and HealthNow New York, Inc. for $212,500; on February 17, 2009, the NYAG announced a settlement with CIGNA for $10 million; on February 18, 2009, the NYAG announced a settlement with WellPoint, Inc. for $10 million; on March 3, 2009, the NYAG announced a settlement with Guardian Life Insurance Company of America for $500,000; and on March 5, 2009, the NYAG announced a settlement with Excellus Health Plan for $775,000 and Capital District's Physician Health Plan for $300,000. The funds from each of these settlements will also be paid to the qualified, non-profit organization charged with establishing the new, independent database to determine fair out-of-network reimbursement rates.

58.    In a press release issued by WellPoint concerning its $10 million settlement with the NYAG, Ken Goulet, Executive Vice President and CEO of WellPoint's Commercial Business, said: "WellPoint is committed to appropriately processing claims and fairly reimbursing healthcare providers for covered services under the terms of each member's contract, while at the same time protecting our members and group customers against excessive charges by some non-participating providers. *WellPoint acknowledges the conflicts of interest in the Ingenix database*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

- 18 -

which the Attorney General's investigation brought to light, and we support his efforts to increase the transparency of health care costs." (emphasis added). Notwithstanding this acknowledgment, WellPoint still uses the Ingenix database to calculate UCR rates.

59.    Apart from the NYAG settlements detailed above, UnitedHealth Group also agreed to the terms of a settlement with a class of consumers and providers, the AMA, Medical Society of the State of New York and others, including the payment of approximately $350 million to settle claims, similar to those alleged in this case, related to the underpayment of reimbursement amounts for out-of-network medical services.

### WELLPOINT UNDERTOOK OTHER ACTIONS DESIGNED TO DEPRESS THE AMOUNTS PAID FOR UCR BEYOND THE INGENIX DATABASE

60.    Upon information and belief, in addition to its use of the Ingenix database, WellPoint used other improper pricing methods to reduce reimbursements to Nonpars during the Class Period. Accordingly, WellPoint violated, and continues to violate, its legal obligations to Plaintiffs and the Class.

61.    Moreover, WellPoint failed to provide Plaintiffs and the Class with material information regarding its out-of-network determinations. WellPoint's lack of disclosure and misrepresentations violates ERISA, RICO, the Sherman Act, and federal common law. By failing to give the Individual Plaintiffs and the Class an explanation of the basis for its UCR or other Nonpar determinations, WellPoint failed to provide the "full and fair review" required by ERISA.

62.    WellPoint also violated various fiduciary, statutory, and common law duties to the Individual Plaintiffs and the Class by not providing a full and fair appeals process, by not disclosing the underlying data on which it purportedly relied on to deny benefits, and by failing to make decisions untainted by its own self-interest.

## PLAINTIFFS' AND THE CLASS' EXPERIENCE WITH WELLPOINT

63.    During the Class Period, WellPoint harmed Plaintiffs and the Class by systematically making improper UCR determinations that reduced lawful reimbursement amounts for Nonpars without valid or compliant data to support such determinations.  WellPoint further harmed the Class by misapplying Par policies to Nonpar claims, and by delaying payment to Nonpars under the pretext of negotiation. As a result of these actions and others, Plaintiffs and the Class were financially harmed and forced to exhaust significant time and resources identifying and then appealing WellPoint's unlawful determinations through a process deliberately designed to deny, delay, and impede Nonpars from obtaining their rightful reimbursement.

**Dr. Henry Has Been Harmed By WellPoint's Unlawful Practices**

64.    Plaintiff Dr. Henry is an internist with a private practice in Pasadena, California.  He is licensed to practice medicine in the State of California, and has been certified by the American Board of Internal Medicine, American Board of Emergency Medicine, American Board of Medical Specialties, Subspecialty in Geriatrics, and American Academy of HIV Medicine, HIV Specialist.

65.    At all relevant times, Dr. Henry was a Nonpar in WellPoint's physicians' networks.  Throughout the Class Period, Dr. Henry provided out-of-network healthcare services to WellPoint plan enrollees, which account for approximately 30-35% of Dr. Henry's annual revenue.  Dr. Henry's experience with WellPoint's unlawful business practices is typical of what has happened to the Class as a whole.

66.    It is difficult for many patients to pay out of pocket for treatment at the time of service.  Instead, patients rely on their health plans to reimburse physicians for their services, leaving the Individual Plaintiffs and the other Class members to advance the cost of procedures.  To facilitate direct payment from insurers, patients sign a form assigning their health benefits to Dr. Henry in advance of treatment.  This form includes an express authorization by the patient for WellPoint to remit payment

directly to Dr. Henry for "professional services otherwise payable to me or the holder of the policy."

67.    At all relevant times, Dr. Henry utilized a HCFA 1500 or more recently a CMS 1500 form, to submit claims for payment to WellPoint.  Dr. Henry's claims are routinely submitted electronically.  Once an electronic claim is submitted it passes through a clearinghouse before reaching WellPoint.  All of Dr. Henry's claims are submitted to WellPoint using CPT codes, Healthcare Common Procedure Coding System ("HCPCS"), and modifiers, as necessary.  Dr. Henry does not find out his compensation from WellPoint for services rendered until after a procedure is performed and a claim for payment is submitted.

68.    At all relevant times, Dr. Henry expected to be reimbursed by WellPoint at the lesser of his billed charges or the current UCR rate.  WellPoint defines UCR as follows:

> A "usual" charge is the amount that is most consistently charged by an individual physician for a given service. A "customary" charge is the amount that falls within a specified range of usual charges for a given service billed by most physicians with similar training and experience within a given geographic area. A "reasonable" charge is a charge that meets the Usual and Customary criteria, or is otherwise reasonable in light of the complexity of treatment of the particular case. Under a UCR Program, the payment is the lowest of the actual billed charge, the physician's usual charge or the area customary charge for any given covered service.

69.    WellPoint unlawfully diminished Dr. Henry's compensation by improperly calculating UCR rates and then misapplying these rates to his claims, as described herein.  Dr. Henry's EOBs and Remittance Advices often state that his billed charges purportedly are "in excess of the allowed expense for a non-participating provider," and that the "Health Plan is not responsible for any amounts in excess of this allowed expense."  However, nowhere on the EOBs, Remittance

Advices or elsewhere in any other correspondence sent to Dr. Henry does WellPoint discuss or identify how it actually calculates UCR. The EOBs do not even specify whether Ingenix data or some other methodology was used in these calculations. With its methods for calculating UCR rates shrouded in a veil of secrecy, WellPoint has been able to derive improper rates using faulty data, and apply them to Nonpar claims in order to diminish lawful reimbursement.

70. WellPoint uses Ingenix data to understate the true market rates of medical care performed by Nonpars. The improper use of this data has caused both patients and Nonpars to experience significant losses. Patients are harmed because payors like WellPoint are not reimbursing out-of-network services at appropriate levels, which results in patients increasingly being billed for amounts in excess of WellPoint's coverage. Nonpars likewise are harmed because they are often unable to collect these balances from their patients and are forced to take a loss for their services. Moreover, because Nonpars are often unaware of the scheme that results in WellPoint failing to pay appropriate UCR rates, they are either powerless to appeal any such improper determinations or their efforts to appeal these determinations are futile.

71. WellPoint's application of faulty UCR rates has also damaged the patient-doctor relationship. As discussed above, WellPoint's conduct has forced Nonpars like Dr. Henry to increasingly bill his patients for the balance of costs not covered by the insurer. The ever-increasing expense of out-of-network treatments, as engineered by WellPoint, incentivizes patients, including Dr. Henry's patients, to leave their regular physicians in search of care from in-network physicians. WellPoint's conduct is solely intended to increase the health insurer's coffers, in relevant part, as follows: by paying Nonpars at below market rates; by discouraging patients from seeking treatment from Nonpars through the improper deferral of healthcare costs to patients; and by attempting to force Nonpars into contracting with WellPoint and accepting discounted fee schedules. The foundation of quality

healthcare is the patient-doctor relationship, which must be safeguarded. WellPoint's improper conduct has damaged this fundamental relationship.

72.    Moreover, WellPoint's EOBs are intentionally uninformative, false, and misleading regarding the use of UCR rates. This ambiguity has resulted in the inconsistent application of UCR rates to deny the Individual Plaintiffs and the Class their lawful reimbursement. Indeed, WellPoint has repeatedly reimbursed Dr. Henry differently for identical procedures performed within the same timeframe, with no explanation for the discrepancy. UCR rates should be applied consistently by WellPoint, but instead are selectively used to deny or diminish lawful reimbursement to the Individual Plaintiffs and other Nonpars.

73.    WellPoint further diminishes reimbursement to the Individual Plaintiffs and the Class by misapplying Par policies to Nonpar claims. Indeed, WellPoint has at times improperly imposed multiple procedure reductions, which are only applicable to Pars, on Dr. Henry's claims to deny and delay him his lawful reimbursement. WellPoint's unlawful actions are deliberate and are intended to delay or diminish lawful reimbursement to Nonpars.

74.    In addition to the foregoing practices, upon information and belief, WellPoint at times will also engage Dr. Henry in a series of pre-payment negotiations that are intended to unlawfully deny, diminish and delay lawful reimbursement. Rather than simply pay Dr. Henry the lesser of his billed charges or UCR, WellPoint (or a third-party hired by WellPoint) will make "offers" to Dr. Henry to pay adjusted prices below UCR amounts. Under the terms of these offers, acceptance of the adjusted price constitutes payment in full and prohibits Dr. Henry from billing the patient for the amount which exceeds the amount of his charges covered by WellPoint (except for deductible, coinsurance, and non-covered items, if any). The only incentive for Dr. Henry to accept these low-ball offers, which he does not do as a matter of practice, is to expedite the processing of the claim and payment (e.g. 10 days from receipt of the agreement). The alternative is to weather the storm, bill the

patient, and hope that the matter is resolved.  Resolution of these claims, however, can often take months or even a year without any assurance that the appropriate amount will be paid.  Upon information and belief, WellPoint uses these so-called pre-payment negotiations as a pretext to delay and diminish reimbursement to the Individual Plaintiffs and the Class.

75.    WellPoint's wrongful practices are intended to strong-arm Nonpars into agreeing to accept a lower rate than they rightfully deserve by holding on to already earned monies for prolonged periods under the pretext of pre-payment negotiation. WellPoint's hope is that Nonpars like the Individual Plaintiffs will accept a highly discounted fee in exchange for "expedited" payment or give up and sign an agreement to participate in WellPoint's network at a rate which is more deeply discounted than would be the case were it not for WellPoint's unfair Nonpar payment policies.

**Dr. Schwendig Has Been Harmed By WellPoint's Unlawful Practices**

76.    Plaintiff Dr. Schwendig is a trauma surgeon at Scripps Memorial Hospital in La Jolla, California.  He is licensed to practice medicine in the State of California, and has been certified by the American Board of Surgery and National Board of Medical Examiners.

77.    At all relevant times, Dr. Schwendig has been a Nonpar in WellPoint's physicians' networks.  Throughout the Class Period, Dr. Schwendig provided out-of-network emergency and trauma healthcare services to WellPoint plan enrollees.  Dr. Schwendig's experience with WellPoint's unlawful business practices is typical of what has happened to the Class as a whole.

78.    As an emergency department-based trauma surgeon, Dr. Schwendig is responsible for the initial resuscitation and stabilization of patients, as well as the ongoing evaluation of patients.    Under California's Health and Safety Code, emergency room doctors are obligated to treat all emergency room patients without regard to whether they are insured or able to pay.  Cal. Health & Safety Code § 1317.

The Code further provides that health plans are in turn required to pay for emergency medical services (by implication and judicial interpretation at UCR rates). Cal. Health & Safety Code § 1371.4(b). This is necessary because emergency room patients are in need of immediate care and generally are not in a position to choose their physicians as routine patients do: in other words, in or out-of-network considerations do not apply under the circumstances. Given the circumstances, Dr. Schwendig's patients are also unable to make an assignment of benefits prior to treatment. WellPoint, nevertheless, routinely acknowledges an assignment of benefits by sending EOBs and remitting payment directly to Dr. Schwendig for services rendered. At times, however, and for no apparent reason, WellPoint will send payment to the patient instead, forcing Dr. Schwendig to recoup his lawful reimbursement from the patient. This presents a significant hardship for trauma surgeons like Dr. Schwendig who do not often treat their patients on a long term out-patient basis – continued treatment is generally delivered by specialists or the patient's primary care physician. Indeed, trauma surgeons like Dr. Schwendig may never see their patients again.

79. At all relevant times, Dr. Schwendig utilized a HCFA 1500 or more recently a CMS 1500 form, to submit claims for payment to WellPoint. Dr. Schwendig's claims are routinely submitted electronically. Once an electronic claim is submitted it passes through a clearinghouse before reaching WellPoint. All of Dr. Schwendig's claims are submitted to WellPoint using CPT codes, Healthcare Common Procedure Coding System ("HCPCS"), and modifiers, as necessary. Dr. Schwendig does not find out his compensation from WellPoint for services rendered until after a procedure is performed and a claim for payment is submitted.

80. At all relevant times, Dr. Schwendig expected to be reimbursed by WellPoint at the lesser of his billed charges or the current UCR rate. While providing services to WellPoint patients, Dr. Schwendig was repeatedly subjected to reductions in reimbursements based on WellPoint's representations that his bills are in excess of

UCR amounts.  In making these improper determinations, WellPoint relied on the flawed and inadequate Ingenix database as well as other improper methods for calculating rates, which fail to identify proper UCR rates.

81.    Rather than simply pay Dr. Schwendig the lesser of his billed charges or UCR rates, WellPoint instead routinely and deliberately reimbursed his claims at below UCR levels, requiring him to exhaust significant amounts of time and energy first identifying and then appealing improperly reimbursed claims.

82.    WellPoint unlawfully diminished Dr. Schwendig's compensation by improperly calculating UCR rates and then misapplying these rates to his claims.  Dr. Schwendig's EOBs and Remittance Advices often state that his billed charges purportedly are "in excess of the allowed expense for a non-participating provider." However, nowhere on the EOBs, Remittance Advices or elsewhere in any other correspondence sent to Dr. Schwendig does WellPoint discuss or identify how it actually calculates UCR.  The EOBs do not even specify whether Ingenix data or some other methodology was used in these calculations.  With its methods for calculating UCR rates concealed, WellPoint has been able to derive improper rates using faulty data, and apply them to Nonpar claims in order to diminish lawful reimbursement.

83.    WellPoint further diminishes reimbursement to the Individual Plaintiffs and the Class by misapplying Par policies to Nonpar claims.  Indeed, WellPoint has improperly imposed multiple procedure reductions, which are only applicable to Pars, on Dr. Schwendig's claims to deny and delay him his lawful reimbursement.  Dr. Schwendig has spent significant time and energy trying to appeal these improper determinations, but is often denied relief even though the multiple surgery reduction does not apply to him as a Nonpar.  WellPoint's unlawful actions are deliberate and are intended to delay or diminish lawful reimbursement to Nonpars.

84.    In addition to its improper UCR determinations, inconsistent applications of UCR, and misapplication of Par policies, WellPoint, or a third-party

hired by WellPoint such as National Care Network, has at times engaged Dr. Schwendig in pre-payment negotiations that were intended to unlawfully deny, diminish and delay lawful reimbursement. Rather than simply pay Dr. Schwendig the lesser of his billed charges or UCR, WellPoint made "offers" to Dr. Schwendig to pay adjusted prices below UCR amounts. Under the terms of these offers, acceptance of the adjusted price often constitutes payment in full and prohibits Dr. Schwendig from billing the patient for the amount which exceeds the amount of his charges covered by WellPoint (except for deductible, coinsurance, and non-covered items, if any). The only incentive to accept these below market offers, which Dr. Schwendig does not do for trauma cases as a matter of practice, is to expedite payment. The alternative is to weather the storm by not receiving payment for services until the dispute is resolved. Resolution of these claims, however, can often take months or even a year to resolve without any assurance that the appropriate amount will be paid. WellPoint uses these so-called pre-payment negotiations as a pretext to delay and diminish reimbursement to the Individual Plaintiffs and the Class.

85.    Upon information and belief, WellPoint's wrongful practices are intended to strong-arm Nonpars into agreeing to accept a lower rate than they rightfully deserve by holding on to already earned monies for prolonged periods under the pretext of negotiation. WellPoint's hope is that Nonpars like the Individual Plaintiffs will accept a highly discounted fee in exchange for "expedited" payment or surrender and sign an agreement to participate in WellPoint's network at a rate which is more deeply discounted than would be the case were it not for WellPoint's unfair Nonpar payment policies.

86.    All of WellPoint's wrongful conduct described above has forced Dr. Schwendig and members of the Class to exhaust significant time and resources identifying and then appealing unlawfully reimbursed claims. Upon identifying an improper payment for a claim, Dr. Schwendig promptly appeals WellPoint's determination by sending a formal letter asking WellPoint to reprocess the claim for

additional payment. Each appeal letter sent by Dr. Schwendig states that "no contract exists between Doctor James Schwendig and Blue Cross that would obligate him to accept your "allowed amount" as payment in full for his services," and further explains that "this was a Trauma/Emergency situation and the patient had no choice of physicians." In addition to sending these appeals letters, Dr. Schwendig makes telephone calls to WellPoint to appeal the insurer's wrongful determinations. Dr. Schwendig has frequently exhausted any administrative appeals available through WellPoint without succeeding in obtaining full and proper reimbursement for his services, leaving a lawsuit as the only alternative.

87. When an appeal is left unsettled, Dr. Schwendig often cannot collect for his services due to WellPoint's failure to comply with its contractual obligations.

**WellPoint's Unlawful Practices Have
Directly Injured the Associational Plaintiffs**

88. The Associational Plaintiffs have also been injured by WellPoint's wrongful conduct. WellPoint's wrongful conduct causes direct injury to members of the Associational Plaintiffs by delaying, denying, impeding and reducing lawful compensation for out-of-network services provided to WellPoint's enrollees.

89. WellPoint's wrongful conduct also causes direct injury to the Associational Plaintiffs as set forth above because they have been, and continue to expend time and resources in dealing with Defendant's practices. This frustrates the Associational Plaintiffs' purpose which is to uphold the doctor patient relationship and ensure the delivery of quality medical care to patients.

90. As a result of WellPoint's conduct, the Associational Plaintiffs have been required to devote substantial time and resources to dealing with the issues concerning WellPoint's wrongful out-of-network reimbursement practices. Specifically, the Associational Plaintiffs devote significant time from several of its employees to deal with the practices at issue herein. The Associational Plaintiffs' efforts to counteract WellPoint's unfair and deceptive practices include, *inter alia*,

counseling their respective members on how to counteract the practices at issue, monitoring WellPoint's practices, advocating on their members' behalf, and/or legislating for insurance reform.

91.    Plaintiffs seek unpaid benefit amounts, treble damages and declaratory and injunctive relief for WellPoint's conduct described herein, on their own behalf and on behalf of the members of the Associational Plaintiffs, and of the Class as defined herein.

## ANTITRUST ALLEGATIONS

92.    WellPoint has committed, and conspired to commit, with its competitors including, among others, UnitedHealth Group and Ingenix, and/or with other third parties numerous violations of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.* WellPoint has combined, conspired and/or agreed with its co-conspirators, including UnitedHealth Group and Ingenix to unreasonably restrain trade in per se violation of Section 1 of the Sherman Act by price fixing with regard to paying reasonable and customary rates for Nonpar transactions.

## INTERSTATE COMMERCE

93.    WellPoint, participates in, and affects, interstate commerce.

94.    WellPoint's activities, including the administration and operation of health plans and managed care plans, in every state in the United States, are in the regular, continuous and substantial flow of interstate commerce, and have a substantial effect upon interstate commerce.

95.    WellPoint's unlawful activities, concerted actions, conspiracy to restrain trade, and agreement to fix prices substantially affect and restrain the operation of interstate commerce.

## WELLPOINT'S AGREEMENT TO FIX PRICES AND ENGAGE IN OTHER ANTI-COMPETITIVE CONDUCT

96.    WellPoint reached an agreement with its competitors, including UnitedHealth Group via its alter ego Ingenix and/or a number of other non-parties to

determine UCR rates using primarily the Ingenix database, as described above, even while knowing that use of the database would result in artificially low reimbursements to Class members. The above concerted action among these "competitors" and co-conspirators has resulted in unlawful and anticompetitive price fixing agreements, and other horizontal restraints of trade and anticompetitive behavior. This unreasonable restraint on trade is a per se violation of Section 1 of the Sherman Act.

97.    UnitedHealth Group, via its alter ego Ingenix, facilitates the direct horizontal agreements through the compiling and sharing of competitive information and UCR rate data among all the co-conspirators.

98.    As stated above, many WellPoint and other contributors to Ingenix are entitled to discounted use of the Ingenix database simply for continuing to submit data at the level at which they submitted data when the database was owned by HIAA.

99.    UnitedHealth Group's ownership of the Ingenix database and sharing of the database's compiled pricing data with each of its competitors is a textbook situation of adopting a benchmark for determining the price to be paid to Nonpars for out-of-network medical services.

100.    WellPoint engaged in price fixing when it agreed with its co-conspirators, including UnitedHealth Group to utilize precisely the same flawed database to determine the UCR amounts for out-of-network medical services, which lead to them paying substantially the same reduced amounts for services rendered to their subscribers.

101.    The Department of Justice Antitrust Division notes in its Price Fixing "Primer" that price fixing agreement can take many forms. "[A]ny agreement that restricts price competitions violates the law." It adds that "examples of price fixing agreements include those to:

    a.    Establish or adhere to price discounts

       b.     Hold prices firm

       c.     Adopt a standard formula for computing prices

       d.     Adhere to a minimum fee or price schedule."

http://www.usdoj.gov/atr/public/guidelines/211578.htm.

102.   WellPoint, along with its co-conspirators, adopted a standard formula for making UCR determinations, based on a database that is designed and intended to reduce reported charges artificially, and each has agreed to a method of determining the maximum price or fee, via database schedule, that it will pay for out-of-network charges. This alone amounts to an agreement to fix prices.

103.   WellPoint's agreement also gives it, collectively with its competitors, tremendous power to set UCR rates well below those which would exist in a competitive marketplace. In fact, no competitive pressure to raise UCR rates exists while all the conspirators act collectively to reduce prices. Without agreement and collective action between them, including the exchange and compilation of relevant pricing data, WellPoint would be unable to systematically and across the board reduce their UCR rates paid. This agreement to fix prices is an unreasonable restraint on trade and a per se violation of Section 1 of the Sherman Act.

104.   In addition to agreeing to price their UCR rates using the exact same database, which is inadequate for the purpose for which it is used, the insurers also engage in other types of parallel behavior. The insurers have substantially similar contracts with their customers in which all material provisions are the same; they all submit UCR rate data to the databases to be compiled; they are all aware that the data submitted leads to skewing the relevant UCR determinations downward; and they all utilize the Ingenix database to determine UCR rates. These parallel behaviors allow their price fixing agreement to effectively depress the UCR rates paid to Nonpars for services rendered to plan subscribers, and otherwise reduce competition among would-be competitors.

105. Collusion, conspiracy and agreement are facilitated with the concentration of a standardized product and with numerous opportunities for WellPoint and its co-conspirators to agree and collude, including involvement and participation in the same trade associations and widespread availability of the Ingenix database. Additionally, where pricing information is shared among the parties, defection from the agreement is easy to detect as it is there for all to see in the data contributed to Ingenix.

106. Additionally, UCR merely represents a cost of doing business with WellPoint. Agreement to systematically reduce these costs benefits each conspirator without affecting its ability to compete for customers. This benefit cannot be achieved without collective agreement.

107. In fact, WellPoint and its co-conspirators enjoy monopoly status or significant market power in certain areas or markets. The agreement to utilize the same flawed database for UCR determinations allows WellPoint to enjoy the market power of its counterparts through the use of competitors' data.

108. The agreement between WellPoint and its co-conspirators to fix and suppress prices also has the perverse effect of strong-arming doctors into becoming Pars of the various "networks" where further cost reducing measures and other methods of control can be imposed on physicians.

109. As noted above, it was only after investigation by the NYAG, in conjunction with a pending class action lawsuit, that UnitedHealth Group agreed that the database used to determine UCR must be independently maintained and that the agreement to fix prices using the database must be abandoned.

## ANTITRUST INJURY

110. WellPoint's market power results from the combined power of its competitors, who also reached agreement to utilize the same database to determine UCR rates and whose role as primary payors gives them the power to impose

artificially low UCR rates and other anti-competitive restrictions on doctors that could not exist in a competitive market.

111.    Competition among the payors has also been reduced by the agreement to improperly reduce UCR amounts.

112.    Without the agreement to fix UCR rates and reduce competition among payors, the Individual Plaintiffs and the Class would have been, and would have continued to be paid more for the out-of-network medical services that they rendered to WellPoint's subscribers.

## CLASS ACTION ALLEGATIONS

113.    The Individual Plaintiffs bring this action on behalf of themselves and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure.  The requirements of subparts 23(a) and (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure are met.  The Individual Plaintiffs bring this class action on behalf of a Class, defined as:

> All non-participating physicians and physicians' groups, within the boundaries of the United States of America, who provided services to any member of any WellPoint insured or administered health plan, at any time during the period September 29, 2006, through the date of certification and were paid less than their billed charge for such "out-of-network" medical services.

114.    The Individual Plaintiffs also bring this action on their own behalf and on behalf of an ERISA Subclass defined as follows:

> All non-participating physicians and physicians' groups, within the boundaries of the United States of America, who provided services to any member of any WellPoint insured or administered group health plan subject to ERISA, at any time during the period September 29, 2006, through the date of certification and were paid less than their billed charge for such "out-of-network" medical services.

115.    Excluded from the Class and the ERISA Subclass are any judge(s) or justice(s) to whom this action is assigned, as well as any relative of such judge(s) or justice(s) within the third degree of relationship, and the spouse of any such person.

## **RULE 23(A)**

## **NUMEROSITY**

116.    This putative Class includes thousands of Nonpars throughout the United States and is therefore so large to make joinder of all members impracticable within the meaning of Fed. R. Civ. P. 23(a)(1).

## **COMMONALITY**

117.    Pursuant to Fed. R. Civ. P. 23(a)(2), there are questions of law or fact common to all class members, including, but not limited to, the following:

      (a)    Whether the amounts paid to the Class, have been fixed, artificially maintained, and/or stabilized by WellPoint and others;

      (b)    Whether WellPoint's use of the Ingenix database or its other Nonpar pricing methods to calculate UCR rates violated ERISA, RICO, or the Sherman Act;

      (c)    Whether WellPoint's Nonpar benefit reductions violated ERISA, RICO or the Sherman Act;

      (d)    Whether WellPoint misapplied Par policies such as multiple procedure reductions to claims submitted by Plaintiffs and the Class;

      (e)    Whether WellPoint's use of the Ingenix database itself resulted in lower UCR determinations than were otherwise available based on appropriate information;

      (f)    Whether WellPoint's failure to properly disclose the specific reason for UCR and Nonpar pricing methods in its EOBs as well as failure to disclose material information (including the offer to disclose the relevant evidence) violated ERISA or RICO;

      (g)    Whether ERISA requires each ERISA Subclass member to prove exhaustion or futility;

(h)    Whether WellPoint violated RICO and, if so, the appropriate relief to be awarded;

(i)    Whether WellPoint combined, conspired and/or agreed with its co-conspirators in a price fixing conspiracy that sought, and was able, to artificially lower, fix or maintain the price paid to Plaintiffs and the Class by WellPoint as UCR rates in violation of the Sherman Act; and

(j)    Whether interest should be added to the payment of unpaid benefits.

## TYPICALITY

118.    The claims of the Individual Plaintiffs are typical of the claims of the defined Class, within the meaning of Fed. R. Civ. P. 23(a)(3), and are based on and arise out of the same uniform and standard illegal practices of the Defendant alleged by the Plaintiffs. The proposed Class representatives state claims for which relief can be granted that are typical of the claims of absent Class members. If litigated individually, the claims of each Class member would require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

## ADEQUACY

119.    The Individual Plaintiffs are committed to pursuing this action and are prepared to serve the proposed Class in a representative capacity with all of the obligations and duties material thereto. The Individual Plaintiffs will fairly and adequately represent the interests of the members of the class within the meaning of Fed. R. Civ. P. 23(a)(4) and have no interests adverse to, or which directly and irrevocably conflict with, the interests of the other Class members.

120.    The Individual Plaintiffs have retained competent counsel experienced in class action litigation. Said counsel will adequately prosecute this action, and will

assert, protect and otherwise well represent the named Class representatives and absent Class members.

## RULE 23(B)(1)(A) AND (B)

121.   The prosecution of separate actions by individual Class members would create a risk of adjudication with respect to individual Class members which would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to this action, or could substantially impair or impede their ability to protect their interests.

122.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent of varying adjudications with respect to individual members of the Class which would establish incompatible rights within the Class.

## RULE 23(B)(2)

123.   WellPoint's actions are generally applicable to the Class as a whole, and the Individual Plaintiffs seek equitable remedies with respect to the Class as a whole, within the meaning of Fed. R. Civ. P. 23(b)(2).

## RULE 23(B)(3)

124.   The common questions of law and fact enumerated above predominate over individual questions, and a class action is a superior method for the fair and efficient adjudication of this controversy, within the meaning of Fed. R. Civ. P. 23(b)(3). Common or general proof will be used for each Class member to establish each element of their ERISA, RICO and antitrust claims. Additionally, proceeding as a class action is superior to other available methods of adjudication. The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation since the cost of litigation far exceeds what any one Class member has at stake.

## COUNT I

### BREACH OF PLAN PROVISIONS FOR BENEFITS IN VIOLATION OF ERISA § 502(A)(1)(B) (ON BEHALF OF ALL PLAINTIFFS AND THE ERISA SUBCLASS)

125. Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein.

126. The Individual Plaintiffs and the ERISA Subclass have standing to pursue these claims as assignees of their patients' out-of-network benefits claims.

127. The Associational Plaintiffs have standing to pursue these claims on behalf of their members through associational standing.

128. During the Class Period, WellPoint breached its plan provisions for benefits by underpaying UCR and other out-of-network reimbursement amounts covered by ERISA healthcare plans to Plaintiffs and the ERISA Subclass in violation of § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

129. WellPoint's breaches included, among other things, the misuse of the Ingenix database and other improper methods to both calculate UCR and reduce other benefits paid to Nonpars for out-of-network medical services.

130. Under the terms of its health plans, WellPoint administers benefits and is a fiduciary.

131. In certain self insured plans which are sometimes designated Administrative Services Only or "ASO," WellPoint makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") with regard to benefits.

132. Where WellPoint acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, WellPoint is liable for underpaid benefits to Plaintiffs and the ERISA Subclass in both fully insured and ASO ERISA health plans.

133.   Pursuant to 29 U.S.C. § 1132(a)(l)(B), Plaintiffs and the ERISA Subclass are entitled to recovery for unpaid benefits and declaratory relief relating to WellPoint's violation of the terms of its health care plans.

## COUNT II

### FOR DECLARATORY RELIEF RELATING TO WELLPOINT'S VIOLATION OF ERISA
### (ON BEHALF OF ALL PLAINTIFFS AND THE ERISA SUBCLASS)

134.   Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein.

135.   The Individual Plaintiffs and the ERISA Subclass have standing to pursue these claims as assignees of their patients' out-of-network benefits claims.

136.   The Associational Plaintiffs have standing to pursue these claims on behalf of their members through associational standing.

137.   Under federal law, Plaintiffs and the ERISA Subclass are entitled to receive protections under ERISA including (a) a "full and fair review" of all claims denied by WellPoint; (b) compliance by WellPoint with ERISA claims procedure regulations; and (c) receipt of accurate materials summarizing such group health plans, known as Summary Plan Descriptions ("SPD") materials under § 102 of ERISA, 29 U.S.C. § 1022.

138.   Any time WellPoint deprived its members of "full and fair review" or proper compliance with ERISA claims procedure regulations, it violated § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), and thus violated the rights of Plaintiffs and the ERISA Subclass.

139.   Although WellPoint was obligated to do so, it failed to provide a "full and fair review" of denied claims pursuant to § 503 of ERISA, 29 U.S.C. § 1133, and its implementing regulations, *inter alia*, by failing to disclose the "specific reasons" for benefit denials, failing to disclose data and/or the methodology used to determine

UCR or Nonpar reimbursement, and failing to comply with appeal procedures imposed by ERISA and the federal common law.

140.   Applicable federal claims procedure regulations set forth minimum standards for claim procedures, appeals, notice to members and the like. By engaging in the conduct described herein including, but not limited to, making benefit determinations for Nonpar claims that are inconsistent with the terms of group health plans, and failing to disclose information concerning the data and/or methodology it used to determine UCR or other Nonpar reimbursements, WellPoint failed to comply with such regulations

141.   The consequences of WellPoint's failure to comply with the regulations (as well as federal common law), are that WellPoint failed to provide reasonable claims procedures and failed to make required disclosures to Plaintiffs and the ERISA Subclass.

142.   Administrative remedies are deemed exhausted, *inter alia*, by virtue of the invalid Ingenix database, other invalid Nonpar pricing methods discussed supra, and WellPoint's failure to provide reasonable claims procedures.  By virtue of the conduct alleged in this Complaint, any appeal would have been futile.

143.   WellPoint's failure to supply accurate SPDs and accurate information is redressable under § 502(c) of ERISA, 29 U.S.C. § 1132(c).

144.   WellPoint's failure to disclose material information about its UCR and other methods for pricing Nonpar claims constitute violation of federal common law, which obligates fiduciaries such as WellPoint to provide this material information.

145.   Plaintiffs and the ERISA Subclass have been harmed by WellPoint's failure to provide a "full and fair review" of appeals submitted under § 503 of ERISA, 29 U.S.C. § 1133, by WellPoint's failure to disclose information relevant to appeals or to comply with ERISA claims procedure regulations, in violation of ERISA and the federal common law, and by WellPoint's failure to provide accurate

information, in violation of federal common law and § 102 of ERISA, 29 U.S.C. § 1022.

146.    Plaintiffs and the ERISA Subclass are entitled to a declaration by this Court that WellPoint's actions as alleged herein are in violation of its duties and obligations of ERISA.

## COUNT III

### FOR VIOLATION OF FIDUCIARY DUTIES OF LOYALTY AND DUE CARE IN VIOLATION OF § 404 OF ERISA (ON BEHALF OF ALL PLAINTIFFS AND THE ERISA SUBCLASS)

147.    Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein.

148.    The Individual Plaintiffs and the ERISA Subclass have standing to pursue these claims as assignees of their patients' out-of-network benefits claims.

149.    The Associational Plaintiffs have standing to pursue these claims on behalf of their members through associational standing.

150.    During the Class Period, WellPoint acted and continues to act as a fiduciary of its members' health plans, as the term fiduciary is interpreted under § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A). At such times, WellPoint also acted and acts as a fiduciary for self-insured plans, including by deciding final appeals.

151.    As a functional fiduciary under ERISA and as a claims fiduciary making final appeal decisions for self-insured plan members, WellPoint owes Plaintiffs and the ERISA Subclass a duty of care, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent fiduciary would use in the conduct of an enterprise of like character. Further, fiduciaries must ensure that they are acting in accordance with the documents and instruments governing the plan, in accordance with § 404(a)(1)(B) and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(B) and (D).  In failing to act prudently, and in failing to act in accordance with the documents governing the plan, WellPoint violated its fiduciary duty of care.

152.   As a fiduciary of health plans under ERISA, WellPoint owed Plaintiffs and the ERISA Subclass a duty of loyalty, defined as an obligation to make decisions in the interest of members, and to avoid self-dealing or financial arrangements that benefit the fiduciary at the expense of members, in accordance with § 406 of ERISA, 29 U.S.C. § 1106. Thus, WellPoint cannot make benefit determinations for the purpose of saving money at the expense of its members.

153.   During the Class Period, WellPoint violated its fiduciary duty of loyalty, *inter alia*, by using the Ingenix database and other methods for pricing Nonpar claims (including default formulas and rounding rules) that benefited itself at the expense of members as well as Plaintiffs and the ERISA Subclass.   In addition, WellPoint violated (and continues to violate) its fiduciary duty of loyalty by failing to inform members as well as Plaintiffs and members of the ERISA Subclass of material information, including but not limited to flaws in the data and methodology used to determine UCR reimbursement. In fact, during the Class Period, by using the U.S. mails and interstate wire facilities, WellPoint made representations *inter alia* about the Ingenix database that it knew were untrue. As a data contributor to the Ingenix database, WellPoint knew many of the flaws that make the Ingenix data an inappropriate basis for UCR.

154.   In relying on the Ingenix database or other improper pricing methods, which were noncompliant with its contractual obligations and invalid to make UCR determinations, and in applying, *inter alia*, a reduction for multiple procedures that was not authorized and nowhere disclosed to members in their plan documents, WellPoint violated its fiduciary obligations to Plaintiffs and the ERISA Subclass.

155.   Plaintiffs and the ERISA Subclass are entitled to assert a claim for relief for WellPoint's violation of its fiduciary duties under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), including declaratory relief, and may seek removal of any fiduciary that breached its duties.

# COUNT IV

## FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)
## BASED ON PREDICATE ACTS OF MAIL AND WIRE FRAUD
## (ON BEHALF OF ALL PLAINTIFFS AND THE CLASS)

156.   Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein.  This claim is asserted by Plaintiffs on their own behalf and on behalf of  Class members.

157.   The Individual Plaintiffs and the Class have standing to pursue these claims as assignees of their patients' out-of-network benefits and as third party beneficiaries of their patients' out-of-network benefits.

158.   The Associational Plaintiffs have standing to pursue these claims both individually and/or on behalf of their members through associational standing.

159.   At all relevant times, WellPoint was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

160.   At all relevant times, and as described in this Complaint, WellPoint carried out its underpayment scheme to defraud Plaintiffs and the Class in connection with the conduct of an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), comprised of WellPoint, UnitedHealth Group and Ingenix among others (the "Enterprise").

161.   At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

162.   As described herein, the Enterprise has and continues to have an ascertainable structure and function separate and apart from the pattern of racketeering activity in which WellPoint has engaged. In addition, the members of the Enterprise function as a structured and continuous unit, and performed roles consistent with this structure. The members of the Enterprise performed certain legitimate and lawful activities that are not being challenged in this Complaint, including the provision of health insurance and plan and claims administration

services by WellPoint, which was done for many claims lawfully and without resort to unlawful practices. However, the collection and dissemination of health insurance information by Ingenix was not legitimate when it involved the creation, use and dissemination of invalid data for use in making UCR determinations. Aside from legitimate activities carried out by the members of the Enterprise, its members used the Enterprise's structure to carry out the fraudulent and unlawful activities alleged in this Complaint including, but not limited to, intentional underpayment of benefits to Plaintiffs and the Class resulting from WellPoint's use of flawed and invalid data for its UCR determinations.

163. The Enterprise was used to create a mechanism or vehicle by which WellPoint could reduce payments to Plaintiffs and the Class for out-of-network services through the use of flawed and invalid data that could not easily be challenged effectively. In particular, as described herein, the Enterprise created what appeared to be an appropriate and unassailable database which reported actual charge data; the Ingenix database was designed to appear valid as a basis for UCR when, in fact, it is and was invalid. Through their roles in the Enterprise, Ingenix benefited directly by enhancing its ability to earn licensing fees through the sale of the Ingenix databases and indirectly through the monies saved by UnitedHealth Group, its parent corporation, while WellPoint benefited by reducing the amount it paid to Plaintiffs and the Class for their out-of-network services through the use of the Ingenix database to price UCR. During the Class Period, Ingenix also used data submitted by data contributors, such as WellPoint, to create other products, the licensing and sale of which directly benefited Ingenix.

164. As alleged above, although Ingenix issues a disclaimer to the users of the Ingenix databases, WellPoint continued to use the Ingenix databases in a manner directly at odds with the disclaimer, while Ingenix knew that its data users were using the Ingenix databases improperly to make UCR determinations and failed to stop it. At the same time it was issuing a disclaimer in a misguided effort to provide itself

and UnitedHealth Group with legal protection, Ingenix was also promoting the Ingenix database as a cost-saving mechanism that could save substantial sums to those such as WellPoint who improperly used and relied upon them in making UCR determinations.

165.    Ingenix provided extensive "litigation support," including vouching for data used to price UCR by its data users. Ingenix employed staff to assist data users, including testifying in court, testifying in depositions, supplying documentation and otherwise bolstering the users' use of Ingenix data to price UCR. Thus, WellPoint and Ingenix expressly observed the disclaimer in the breach, despite the fact that the disclaimer correctly stated that the Ingenix database could not be used as a basis for making UCR determinations. WellPoint provided data to Ingenix which it knew would be edited by Ingenix in a manner which precluded its use for UCR.

166.    Similarly, as alleged herein, Ingenix and WellPoint knew that UCR data is invalid if it fails to reflect necessary information. WellPoint knew that Ingenix actually used only four basic data points (billed charge, the first 3 digits of the provider zip code, date of service and five digit CPT code without modifier) to produce the final Ingenix database. Both WellPoint and Ingenix knew that the Ingenix data was invalid for use as UCR, but WellPoint consummated the fraud in which WellPoint continued to send the four data points to Ingenix and Ingenix continued to use the four data points to create the invalid UCR database which it sent to WellPoint to under price UCR.

167.    Ingenix not only sought and accepted WellPoint's incomplete data, but it continued to provide a significant discount to WellPoint and to provide "litigation support" for UCR pricing made by WellPoint using the Ingenix data. Ingenix also failed to conduct any audits or reviews of the data it received from data contributors, including WellPoint. These actions were taken in furtherance of Ingenix's effort to understate UCR amounts for the benefit of the WellPoint-Ingenix Enterprise.

168.   WellPoint's submission of data to Ingenix benefited Ingenix, and users of the Ingenix databases, including WellPoint.

169.   Ingenix and WellPoint knew that the Ingenix databases were being used without Plaintiffs and the Class ever being informed of the disclaimer or the inherent flaws in the Ingenix databases. For example, WellPoint falsely reported to Plaintiffs and Class members, via U.S. mail and interstate wire communications, that its reductions in amounts paid for out-of-network services were based on UCR when, in fact, the reductions were based on flawed and invalid numbers obtained from the Ingenix databases that substantially underreported UCR.

170.   During the Class Period, WellPoint participated in the conduct of the Enterprise in order to shift the costs of medical treatment from WellPoint to its members and therefore to Plaintiffs and the Class, to reduce WellPoint's UCR payments and to create an appearance of legitimacy for its out-of-network benefit reductions. Using U.S. mail and interstate wire facilities, WellPoint provided false and misleading information to Plaintiffs and the Class to convert those withheld funds for the Enterprise's own direct and indirect financial gain, and to discourage its members from using out-of-network healthcare providers. Because WellPoint saves money when participating providers render services, the operations of the Enterprise saved WellPoint money at the expense of Plaintiffs and the Class. In turn, the Enterprise benefited from the pattern of racketeering activity through the reduction of UCR costs by WellPoint and other users of the Ingenix databases, which would not have been obtained absent entry into the Enterprise and was, in addition to the conduct of WellPoint alleged above, the shared goal of the Enterprise for which its members functioned as a continuous unit.

171.   WellPoint further used the Enterprise to facilitate its goal of reducing out-of-network benefits paid to Plaintiffs and the Class by submitting incomplete and inadequate data to Ingenix, thereby artificially reducing the numbers that would be reported in the final Ingenix databases and which WellPoint relied upon to make

UCR determinations. As part of this fraudulent scheme, as alleged herein, WellPoint intentionally submitted, via U.S. mail and interstate wire facilities, data which it knew would be used to create false databases used to price UCR for its members and members of other healthcare plans. Neither Ingenix nor its parent company, UnitedHealth Group, took steps to stop or prevent or reject inadequate data that Ingenix received from WellPoint and other data contributors. Ingenix was aware of the inadequacy of data contributed by data contributors such as WellPoint, but allowed it to occur, since it was consistent with Ingenix's goal to underreport UCR amounts.

172.    If WellPoint had not participated in the conduct of the Enterprise by submitting inadequate data to Ingenix, and using the Ingenix database, it would not have been able to obtain the benefits it did from the Enterprise. Ingenix needed sufficient data to allow it to represent to its customers that the Ingenix database was the largest available and had sufficient numbers to remove any doubt as to their validity. WellPoint knew such representations were being made by Ingenix and used Ingenix's representations for the identical purpose of removing doubt as to their validity. Ingenix needed the data to provide databases to its users to save them money on Nonpar claims. Without data from WellPoint and other large data contributors, the Ingenix database could not have been successfully marketed as the "industry standard" for UCR pricing. Similarly, WellPoint could not have saved the millions of dollars it did if it had not used the Ingenix databases for making UCR determinations even though it knew that they were flawed and invalid. By using the Ingenix database for making its UCR determinations, misrepresenting them, through use of the U.S. mail and interstate wire facilities, as providing a valid and unassailable basis for such decisions, and deterring its subscribers as well as members of the Class from challenging or otherwise raising questions over how it set UCR, WellPoint was able to benefit substantially from its role in assisting the control and direction of the Enterprise, along with Ingenix and UnitedHealth Group.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

173.  Despite their mutual knowledge that the Ingenix data did not determine UCR, WellPoint both defended the Ingenix data when questioned about UCR determinations based on it and by agreement relied on Ingenix to provide detailed "support" so it could defend its use of Ingenix data. Ingenix promised to supply witnesses in court in the event WellPoint's use of Ingenix data was challenged. In the course of appeals and other questions from WellPoint subscribers as well as members of the Class, Ingenix provided graphs and other details, vouching for the accuracy and legitimacy of its data. WellPoint then used the detail from Ingenix to vouch for the Ingenix data to the WellPoint subscribers or members of the Class who were questioning UCR.

174.  Through its wrongful conduct as alleged herein, WellPoint, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

175.  WellPoint, acting through its officers, agents, employees and affiliates, has committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to and during the Class Period, and continues to commit such predicate acts, in furtherance of its underpayment scheme for out-of-network services, including (a) mail fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. § 1343. Such predicate acts include the following:

(a)  mailing, causing to be mailed and/or knowingly agreeing to the mailing of various materials and information including, but not limited to, letters regarding preauthorization approval(s) and/or appeals; materially false and misleading UCR determinations, EOBs and remittance advices for the purpose of saving WellPoint money at the expense of Plaintiffs and the Class, and mailing materially false data for use in the Ingenix database, with each such mailing constituting a separate and distinct violation of 18 U.S.C. § 1341; and

(b)     transmitting, causing to be transmitted and/or knowingly agreeing to the transmittal of various materials and information including, but not limited to, preauthorization approvals; materially false UCR determinations and related explanation of such determinations, and materially false data for use in the Ingenix database, by means of telephone, facsimile and the Internet, in interstate commerce, for the purpose of effectuating the above-described false payment schemes, and each such transmission constituting a separate and distinct violation of 18 U.S.C. § 1343.

176.   WellPoint issued false and misleading letters to providers regarding benefits, as well as false and misleading EOBs and Explanations of Payment. WellPoint instructed its claims personnel to make out-of-network benefit reductions that were contrary to the law. WellPoint knew that the data it contributed to Ingenix was inadequate and lacked required data fields essential for Ingenix to evaluate the data and include (or exclude) it in final UCR fee schedules, but WellPoint continued to use the Ingenix databases to make UCR determinations anyway.

177.   In furtherance of its underpayment scheme for out-of-network services, WellPoint, in violation of 18 U.S.C. §§ 1341, 1343, 1961 and 1962, repeatedly and regularly used the U.S. mail and interstate wire facilities to further all aspects of the intentional underpayment to Plaintiffs and the Class by delivering and/or receiving materials necessary to carry out the scheme to defraud Plaintiffs and the Class

178.   The foregoing communications, sent via U.S. mail and interstate wire facilities, contained false and fraudulent misrepresentations and/or omissions of material facts, had the design and effect of preventing a meaningful evaluation and review of the Enterprise's UCR determinations, and/or otherwise were incident to an essential part of WellPoint's scheme to defraud Plaintiffs and the Class described in this Complaint. Further, such written communications were used by WellPoint to provide the underpayment scheme for out-of-network services with an appearance of legitimacy and regularity, and/or postpone ultimate discovery and complaint of the

underpayment scheme for out-of-network services, thereby making their discovery less likely than if no such mailings or wire transmissions had taken place.

179.  As named fiduciaries and claims administrators of various of the WellPoint plans, WellPoint occupied and occupies a position of trust and it had, and has, a special relationship with its members, and therefore with Plaintiffs and the Class, that requires it to accurately represent the terms and conditions of the WellPoint plans, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

180.  Each such use of the U.S. mail and interstate wire facilities alleged in this Complaint constitutes a separate and distinct predicate act of "racketeering activity" and, collectively, constituted a "pattern of racketeering activity."

181.  The above-described pattern of racketeering activity is related because it involves common persons (namely, Plaintiffs and the Class), common out-of-network claim practices, common results impacting upon common victims, and is continuous because it occurred over several years, and constitutes the usual practice of WellPoint and the Enterprise, such that it amounts to and poses a threat of continued racketeering activity. WellPoint's scheme to defraud Plaintiffs and the Class is open-ended and on-going.

182.  The direct and intended victims of the pattern of racketeering activity described previously herein are Plaintiffs and the Class, whom WellPoint has underpaid out-of-network services.

183.  Plaintiffs and the Class were injured by reason of WellPoint's RICO violations because they were underpaid for services rendered to WellPoint's enrollees and were forced to exhaust significant time and resources addressing WellPoint's wrongful practices.  WellPoint further deprived them of the knowledge necessary to adequately challenge the underpayments. Their injuries were proximately caused by WellPoint's violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of WellPoint's RICO violations

(and commission of underlying predicate acts) and, but for WellPoint's RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

184.   Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiffs and the Class are entitled to recover threefold their damages, costs and attorneys' fees from WellPoint and other appropriate relief.

## COUNT V

### FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)
### FOR PREDICATE ACTS UNDER 18 U.S.C. § 664
### AS WELL AS MAIL AND WIRE FRAUD
### (ON BEHALF OF ALL PLAINTIFFS AND THE ERISA SUBCLASS)

185.   Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein, including, but not limited to, the allegations of Count IV describing the Enterprise. This claim is asserted by Plaintiffs on behalf of themselves and on behalf the members of the ERISA Subclass described above.

186.   The Individual Plaintiffs and the ERISA Subclass have standing to pursue these claims as assignees of their patients' out-of-network benefits and as third party beneficiaries of their patients' out-of-network benefits.

187.   The Associational Plaintiffs have standing to pursue these claims both individually and/or on behalf of their members through associational standing.

188.   Section 1961(1)(B) of RICO specifically identifies as a predicate act "any act which is indictable under ... [§] 664 (relating to embezzlement from pension and welfare funds)" as a predicate act. 18 U.S.C. § 1961(l)(B). Section 664 of Title 18 provides:

> **Theft or embezzlement from employee benefit plan**
> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any

fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

189.  Each of the WellPoint healthcare plans which is an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(1)(A), and otherwise is subject to "any provision" of Title I of ERISA is included in this Count.

190.  Each of the WellPoint healthcare plans that are subject to ERISA or are a non-ERISA plan funded by insurance coverage WellPoint provides or administers, is subject to Section 664 of Title 18. The applicable plan documents expressly state that all benefits due under the plan terms will be paid and that the underlying benefits they expressly guarantee are plan assets.

191.  The governing plan documents warrant that all benefits due under the plans will be paid. By improperly reducing payments on out-of-network claims, WellPoint intentionally caused Plaintiffs and the members of the ERISA Subclass to be underpaid guaranteed benefits to which they were otherwise entitled in accordance with the terms of their group health plans.

192.  For fully insured health care plans, in which WellPoint both administered the plans and paid the benefits from its own assets, WellPoint benefited from the conversion of assets from its ERISA plans. Whereas these assets should have been held by WellPoint in its fiduciary capacity under ERISA and non-ERISA plans and paid to its members, WellPoint improperly withheld such funds and maintained them as part of its own assets for WellPoint's own benefit. For self-funded health care plans, WellPoint made final appeal decisions and intentionally caused underpayment of benefits to Plaintiffs and the ERISA Subclass in order to justify its receipt of administrative fees.

193.  WellPoint acted with specific intent to deprive Plaintiffs and ERISA Subclass members of guaranteed benefits, and was sufficiently aware of the facts to know that it was acting unlawfully and contrary to the trust placed in them by

Plaintiffs, ERISA Subclass members and the insurers whose plans it was administering.

194. Each false payment on a claim constitutes a separate and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended member, for WellPoint's direct or indirect benefit.

195. As set forth above, WellPoint concocted multiple and multi-faceted schemes, including use of the Ingenix database, to make improperly reduced payments for out-of-network services.

196. In furtherance of its false payment schemes, WellPoint, in violation of 18 U.S.C. §§ 1341 and 1343, repeatedly and regularly used the U.S. mail and interstate wire facilities to advance all aspects of the false payment schemes by delivering and/or receiving materials, including plan documents, insurance policies, summary plan descriptions, certificates of coverage, claim forms, reimbursement checks, EOBs describing UCR determinations, appeal determinations, overpayment actions, pre authorization decisions, referrals to collection agencies, representations to regulators, and other materials necessary to effectuate the false payment schemes, as well as to contribute, edit and manipulate the source data for the Ingenix databases.

197. The foregoing mail communications and wire communications contained false and fraudulent misrepresentations and omissions of material facts, and otherwise were incident to an essential part of the false payment schemes and were used to provide the false payment schemes with an appearance of legitimacy and regularity, and postpone ultimate discovery and complaints of the false payment schemes, and thereby make the discovery of the false payment schemes less likely than if no such mailings or wire transmissions had taken place, and had the design and effect of preventing a meaningful evaluation and review of WellPoint's Nonpar pricing methods.

198. As named fiduciaries and claims administrators of various of the WellPoint healthcare plans, WellPoint occupied and occupies a position of trust and it had, and has, a special relationship with Plaintiffs and ERISA Subclass members that requires it to accurately represent the terms and conditions of the WellPoint healthcare plans, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

199. Each such use of the U.S. mail and interstate wire facilities constitutes a separate and distinct predicate act of "racketeering activity."

200. The above-described acts of conversion of employee benefit plan funds, and mail and wire fraud, are related because they each involved common participants, common methodologies, common results impacting upon common victims and a common purpose of executing the false payment schemes, and are continuous because they occurred over a significant period of years, and constitute the usual practice of WellPoint such that they amount to and pose a threat of continued racketeering activity.

201. The purpose of WellPoint's false payment scheme was to underpay the guaranteed benefits to which were assigned to Plaintiffs and ERISA Subclass members, and convert those withheld funds for its own direct or indirect financial gain. WellPoint created an appearance of regularity and legitimacy by providing false and incomplete information to Plaintiffs and ERISA Subclass members, in order to increase revenue through its plan and claims administration business.

202. The direct and intended victims of the pattern of racketeering activity described previously herein are Plaintiffs and ERISA Subclass members, who WellPoint deprived of the complete guaranteed benefits to which they are entitled for out-of-network services.

203. WellPoint's RICO violations injured Plaintiffs and ERISA Subclass members by depriving them of hundreds of millions of dollars in guaranteed benefits on their claims for reimbursement of out-of-network charges, as well as the

knowledge necessary to challenge false and manipulative UCR determinations, and their injuries were proximately caused by the violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of WellPoint's RICO violations (and commission of underlying predicate acts), and but for WellPoint's RICO violations (and commission of underlying predicate acts), Plaintiffs and ERISA Subclass members would not have suffered the injuries suffered by them.

204.    As a result of its misconduct, WellPoint is liable to Plaintiffs and the ERISA Subclass in an amount to be determined at trial. Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiffs and ERISA Subclass members are entitled to recover threefold their damages, and costs and attorneys' fees from WellPoint.

## COUNT VI

### FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(D)
### (ON BEHALF OF ALL PLAINTIFFS AND THE CLASS)

205.    Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein.

206.    The Individual Plaintiffs and the Class have standing to pursue these claims as assignees of their patients' out-of-network benefits and as third party beneficiaries of their patients' out-of-network benefits.

207.    The Associational Plaintiffs have standing to pursue these claims both individually and/or on behalf of their members through associational standing.

208.    From September 29, 2006, WellPoint conspired with UnitedHealth Group, Ingenix and others known and unknown to conduct or participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity as described above in violation of 18 U.S.C. § 1962(d).  This conspiracy to violate 18 U.S.C. § 1962(c) constitutes a violation of 18 U.S.C. § 1962(d).

209.   In furtherance of this conspiracy, WellPoint and others known and unknown to Plaintiffs committed numerous overt acts as alleged above in the pattern of racketeering described above.

210.   As a direct and proximate result of, and by reason of, the activities of WellPoint and its conduct in violation of 18 U.S.C. § 1962(d), Plaintiffs and the Class have been injured within the meaning 18 U.S.C. § 1964(c).

211.   Plaintiffs and the Class are, therefore, entitled to recover treble damages together with the costs of this lawsuit, expenses and reasonable attorneys' fees.

## COUNT VII

### FOR VIOLATION OF SECTION ONE
### OF THE SHERMAN ACT
### (ON BEHALF OF ALL PLAINTIFFS AND THE CLASS)

212.   Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein.

213.   The Individual Plaintiffs and the Class have standing to pursue these claims as assignees of their patients' out-of-network benefits and as third party beneficiaries of their patients' out-of-network benefits.

214.   The Associational Plaintiffs have standing to pursue these claims both individually and/or on behalf of their members through associational standing.

215.   WellPoint, along with Ingenix and its competitors, have combined, conspired and/or agreed with one another, and/or with unnamed co-conspirators, to unreasonably restrain trade in per se violation of Section One of the Sherman Act, 15 U.S.C. § 1. WellPoint combined, conspired and/or agreed with its co-conspirators in a horizontal price fixing conspiracy that sought, and was able, to artificially lower, fix or maintain the price paid to Plaintiffs and the Class by WellPoint as UCR rates.

216.   The above agreement and/or conspiracy to fix prices is a per se violation of Section 1 of the Sherman Act, which operates at the expense of doctors (as well as subscribers) resulting in lower UCR rates of payment to doctors.   The above

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

agreement and conspiracy illegally restrains competition in a number of ways, including:

      (a)    Fixing the price of UCR rates for Nonpar services at levels far below the level that would exist in a truly competitive market;

      (b)    Accomplishing this price fixing by agreeing to peg the UCR rates to the same Ingenix database thereby using the same essential pricing formula;

      (c)    Putting extreme additional competitive pressure on Nonpars to become part of particular networks by collusively refusing to even honor competitive market rates for those medical services in the UCR determinations.

217.   The above "price fixing" scheme has reduced the amount Plaintiffs and the Class are paid for their services below competitive levels.  However, because of the overwhelming market power that the users of Ingenix collectively maintain in the market, and because of the conspiracy and/or agreement among WellPoint, its competitors and/or other parties to fix prices and not compete, there is no way to avoid interaction with the conspiracy.  Because of this conspiracy, WellPoint and its co-conspirators, including UnitedHealth Group maintain their oligopoly by reducing costs all the while squeezing payments for out-of-network services to unconscionably low levels.

218.   All of the aforementioned agreements and/or conspiracies affect interstate commerce and have resulted in antitrust injury to the Plaintiffs and the Class.

219.   Plaintiffs and the Class are entitled to damages under 15 U.S.C. § 15, et seq.

220.   As a result of the illegal agreements and/or conspiracies, WellPoint has caused the Plaintiffs and the Class to suffer financial loss in that WellPoint, with its

agreements to fix prices and collective market strength, pays Plaintiffs and the Class at UCR rates that are set at unconscionably low and uncompetitive levels.

221.    As a consequence of WellPoint's illegal agreements and/or conspiracies, Plaintiffs have suffered and will continue to suffer financial loss and have been injured and will continue to be injured in their business of providing and enhancing medical services.  Among other things, Plaintiffs and the Class received less payment for their medical services than they would have in the absence of the agreement among WellPoint the other users of Ingenix to fix the prices paid for Plaintiffs' out-of-network medical treatment.

222.    Plaintiffs and the Class are entitled to recover such actual damages as the jury may find, threefold, plus costs, expenses and attorneys fees.

223.    Plaintiffs and the Class further seek injunctive relief in the form of order prohibiting WellPoint from engaging in the anti-competitive, discriminatory and otherwise wrongful behavior described above.

**WHEREFORE**, Plaintiffs, the Class, and the ERISA Subclass demand judgment in their favor against WellPoint as follows:

1.    Certifying the Class and ERISA Subclass as set forth in this Complaint, and appointing the Individual Plaintiffs as representatives for these classes;

2.    Declaring that WellPoint has breached the terms of its members plans with regard to out-of-network benefits in its members' health plans, and thereby awarding damages to Plaintiffs and the ERISA Subclass for unpaid benefits in ERISA plans to Plaintiffs and the ERISA Subclass, as well as awarding declaratory relief with respect to WellPoint's violations of ERISA;

3.    Declaring that WellPoint has failed to provide a "full and fair review" to Plaintiffs and the ERISA Subclass under § 503 of ERISA, 29 U.S.C. § 1133, and awarding declaratory relief with respect to WellPoint's violation of ERISA;

4.    Declaring that WellPoint has violated its disclosure obligations under ERISA and the federal common law, including under § 104(b)(4) of ERISA, 29

U.S.C. § 1024(b)( 4), and § 102 of ERISA, 29 U.S.C. § 1022, for which Plaintiffs and the ERISA Subclass are entitled to declaratory relief;

5.    Declaring that WellPoint violated federal claims procedures and SPD disclosure requirements under ERISA and that "deemed exhaustion" under the ERISA regulations is in effect as a result of WellPoint's actions;

6.    Declaring that WellPoint is liable to Plaintiffs and the Class pursuant to RICO, 18 U.S.C. §§, 1962(c), (d) and 1964(c) for threefold their damages, costs and attorney fees and awarding such relief;

7.    Enjoining WellPoint from committing the RICO violations described above in the future and/or declaring their invalidity;

8.    Declaring that WellPoint violated federal antitrust law and is liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 15, et seq. for threefold their damages, costs and attorney fees and awarding such relief;

9.    Enjoining WellPoint from committing the antitrust violations described above in the future and/or declaring their invalidity;

10.    Enjoining WellPoint from using the Ingenix database as well as Medicare fees to determine UCR, along with other Nonpar benefit reductions;

11.    Enjoining WellPoint from committing any violation of law proven at trial;

12.    Awarding Plaintiffs and the Class the costs and disbursements of this action, including reasonable attorneys' fees, costs and expenses in amounts to be determined by the Court;

13.    Ordering WellPoint to recalculate and issue unpaid benefits to Plaintiffs and Class members that were underpaid as a result of WellPoint's improper UCR determinations;

14.    Awarding prejudgment interest; and

15.    Granting such other and further relief as is just and proper.

# JURY TRIAL DEMAND

Plaintiffs demand a jury trial for all claims so triable.

Dated: March 25, 2009                    By: _____

Edith M. Kallas (*phv pending*)          D. Brian Hufford (*phv pending*)
Joe R. Whatley, Jr. (*phv pending*)      Robert J. Axelrod (*phv pending*)
W. Tucker Brown (*phv pending*)          **POMERANTZ HAUDEK BLOCK**
Laurence J. Hasson (*phv pending*)       **GROSSMAN & GROSS LLP**
**WHATLEY DRAKE & KALLAS, LLC**          100 Park Avenue
1540 Broadway, 37th Floor                New York, NY 10017
New York, NY 10036                       (212) 661-1100
(212) 447-7070

Raymond P. Boucher (CA Bar # 115364)     *Attorneys for Plaintiffs*
Helen Zukin (CA Bar # 117933)
Michael Eyerly (CA Bar # 178693)
**KIESEL BOUCHER LARSON LLP**
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910
(310) 854-4444

*Additional Counsel for Plaintiffs*

James E. Cecchi
**CARELLA, BYRNE, BAIN, GILFILLAN,**
**CECCHI, STEWART & OLSTEIN**
5 Becker Farm Road
Roseland, New Jersey 07068

Timothy Blood (CA Bar # 149343)
**COUGHLIN STOIA GELLER RUDMAN**
**& ROBBINS LLP**
655 W. Broadway, Suite 1900
San Diego, CA 92101

Ralph Knowles / Kenneth Canfield
**DOFFERMYRE SHIELDS CANFIELD & KNOWLES, LLC**
1355 Peachtree Street, Suite 1600
Atlanta, GA 30309

Nicholas B. Roth
**EYSTER KEY TUBB WEAVER & ROTH**
402 E. Moulton Street
Decatur, Alabama 35601

Archie Lamb, Jr.
**LAW OFFICES OF ARCHIE LAMB, LLC**
2017 Second Avenue North, 2nd Floor
Birmingham, Alabama  35203

Stuart Liner (CA Bar # 137495) / Angela Agrusa (CA Bar # 131337)
**LINER, YANKELEVITZ, SUNSHINE**
**& REGENSTREIF LLP**
1100 Glendon Avenue, 14th Floor
Los Angeles, CA 90024

Dennis G. Pantazis
**WIGGINS, CHILDS, QUINN & PANTAZIS, LLC**
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama  35203

J. Mark White
**WHITE ARNOLD ANDREWS & DOWD**
2025 3rd Avenue North, Suite 600
Birmingham, Alabama  35203

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Consuelo B. Marshall and the assigned discovery Magistrate Judge is Victor B. Kenton.

The case number on all documents filed with the Court should read as follows:

## CV09- 2039 CBM (VBKx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[ ] Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[ ] Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)          NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Raymond P. Boucher (SBN 115364)
boucher@kbla.com
KIESEL BOUCHER LARSON LLP
8648 Wilshire Boulevard
Beverly Hills, California 90211
Telephone: (310) 854-4444

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

AMERICAN MEDICAL ASSOCIATION, CALIFORNIA
MEDICAL ASSOCIATION, MEDICAL ASSOCIATION OF
GEORGIA, CONNECTICUT STATE MEDICAL SOCIETY,
and NORTH CAROLINA MEDICAL SOCIETY, and STEPHEN
D. HENRY, M.D. and JAMES G. SCHWENDIG, M.D.,
Individually And On Behalf of All Others Similarly Situated,

PLAINTIFF(S)

V.

WELLPOINT, INC.

DEFENDANT(S).

CASE NUMBER

**CV09-2039 CBM VBKx**

**SUMMONS**

TO:    DEFENDANT(S):  __WELLPOINT, INC.__

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you
must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint
☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer
or motion must be served on the plaintiff's attorney, _Kiesel Boucher & Larson LLP_____, whose address is
_8648 Wilshire Boulevard, Beverly Hills, California 90211_____. If you fail to do so,
judgment by default will be entered against you for the relief demanded in the complaint.  You also must file
your answer or motion with the court.

Clerk, U.S. District Court

Dated: ___**MAR 2 5 2009**_____

By: _Natalie Grangara_
                Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed
60 days by Rule 12(a)(3)].*

Raymond P. Boucher (SBN 1●●64)
boucher@kbla.com
KIESEL BOUCHER LARSON LLP
8648 Wilshire Boulevard
Beverly Hills, California 90211
Telephone: (310) 854-4444

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN MEDICAL ASSOCIATION, CALIFORNIA MEDICAL ASSOCIATION, MEDICAL ASSOCIATION OF GEORGIA, CONNECTICUT STATE MEDICAL SOCIETY, and NORTH CAROLINA MEDICAL SOCIETY, and STEPHEN D. HENRY, M.D. and JAMES G. SCHWENDIG, M.D., Individually And On Behalf of All Others Similarly Situated,<br><br>PLAINTIFF(S)<br><br>V.<br><br>WELLPOINT, INC.<br><br>DEFENDANT(S). | CASE NUMBER<br><br>CV09-2039 CBM<br><br>**SUMMONS** |

TO:    DEFENDANT(S): __WELLPOINT, INC.__

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, __Kiesel Boucher & Larson LLP_____, whose address is __8648 Wilshire Boulevard, Beverly Hills, California 90211_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ____MAR 2 5 2009____

By: _____**NATALIE LONGORIA**_____

Deputy Clerk

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

1198

CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)

AMERICAN MEDICAL ASSOCIATION, CALIFORNIA MEDICAL ASSOCIATION, MEDICAL ASSOCIATION OF GEORGIA, CONNECTICUT STATE MEDICAL SOCIETY, and NORTH CAROLINA MEDICAL SOCIETY, and STEPHEN D. HENRY, M.D. and JAMES G. SCHWENDIG, M.D., Individually And On Behalf of All Others Similarly Situated,

**DEFENDANTS**

WELLPOINT, INC.

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

KIESEL BOUCHER LARSON LLP
8648 Wilshire Boulevard, Beverly Hills, CA 90211
(310) 854-4444

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes   ☐ No   ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
ERISA, 29 U.S.C. Sec. 1132; RICO, 18 U.S.C. Sec. 1962; Sherman Act, 15 U.S.C. Sec. 1

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☑ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **IMMIGRATION** | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**CV09-2039**

**FOR OFFICE USE ONLY:    Case Number:** _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)                              CIVIL COVER SHEET                              Page 1 of 2

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑Yes
If yes, list case number(s):   CV09-1886 PSG (CTx)

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☑ A.  Arise from the same or closely related transactions, happenings, or events; or
                                                    ☑ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                                                    ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                                                    ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles - Stephen D. Henry, M.D. | San Diego - James G. Schwendig, M.D.; Georgia - Medical Association of Georgia; Illinois - American Medical Association; Connecticut - Connecticut State Medical Society; Sacramento - California Medical Association; North Carolina-North Carolina Medical Society. |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles - Wellpoint, Inc. | |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
       **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _____   Date March 24, 2009

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |